UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

RAVI KALIA,                                                      COMPLAINT
                        Plaintiff,

        - against -                                             Case No: 20 CIV

THE CITY COLLEGE OF NEW YORK;                                   JURY TRIAL DEMANDED
CITY UNIVERSITY OF NEW YORK;
VINCENT BOUDREAU; PAUL
OCHIOGROSSO; and EREC KOCH;
                        Defendants.
--------------------------------------------------------X

COMES NOW Ravi Kalia ("Kalia"), by his attorneys, The Law Office of Neal Brickman,

P.C., located at 420 Lexington Avenue - Suite 2811, New York, New York 10170, and for his

complaint against defendants, City University of New York ("CUNY"), Vincent Boudreau

('Boudreau"), Paul Occhiogrosso ("Occhiogrosso") and Erec Koch ("Koch," and together with

CUNY, Boudreau, and Occhiogrosso, the "Defendants" or "defendants," and together with

Boudreau and Occhiogrosso, the "Individual Defendants"), hereby avers and states as follows:

<u>Statement Pursuant to Local Civil Rule 1.9</u>

1.      Plaintiff is an individual citizen of the United States of America and, as such, has

no interests or subsidiaries that need to be disclosed.

<u>Nature of the Action</u>

2.      This action arises under Title VII of the Civil Rights Act of 1964, as amended;

New York Executive Law §296 et seq. and New York City Administrative Code §8-107 et seq.,

as well as various additional state and common law causes of action based on Defendants'

improper, discriminatory, retaliatory and disparate treatment of Professor Kalia.

3.      This action seeks compensatory and punitive damages, as well as costs and attorneys' fees, based on the continuing policy of discriminatory and retaliatory actions undertaken by Defendants in improperly delaying and orchestrating the denial of Professor Kalia's application for Distinguished Professor ("DP") and subjecting Professor Kalia to an ongoing hostile work environment and continued harassment based on improper animus based on Professor Kalia's race and national origin – namely Indian, and not Caucasian – and in retaliation for acts that he had taken to protect his own civil rights, as well as the rights of others.

<u>Jurisdiction</u>

4.      Jurisdiction over the federal claims is invoked pursuant to 28 U.S.C. § 1331, in that these claims arise under the laws of the United States; and over the state law claims pursuant to the doctrine of pendent jurisdiction as codified in 28 U.S.C. § 1367.  This action is timely filed within ninety (90) days of the issuance on June 9, 2022 of a valid Right to Sue letter from the Equal Employment Opportunity Commission ("EEOC"), a copy of which is annexed hereto as Exhibit "A".

<u>Venue</u>

5.      This action is properly laid in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1), because the defendant resides in this judicial district, and (b)(2), because a substantial part of the events and omissions giving rise to the claim occurred in this judicial district.

<u>Parties</u>

6.      Professor Kalia is an individual citizen of the United States of America of Indian descent and a resident of the State of New York, and who is not Caucasian.  Professor Kalia is a

tenured full professor of History at the City College of New York ("CCNY") within the City University of New York ("CUNY") system.

7.        CUNY is a state university system operating within the City of New York as created and designated pursuant to, inter alia, New York Education Law §6210.  It has a distinct legal existence from the State of New York.  CUNY has its own by-laws and regulations, and it and its employees are governed by the relevant Collective Bargaining Agreement ("CBA") that was in place at the relevant time.

8.        Upon information and belief, Vincent Boudreau ("Boudreau") is an individual citizen of the State of New York, a resident of the State of New York and was the Interim President of CCNY – now the President of CCNY.   President Boudreau qualifies as an "employer" for purposes of individual liability under New York Executive Law § 296, and New York City Administrative Code  §§ 8-107 and 8-502 because he participated directly in the discriminatory conduct at issue in this case and as an "employer" under § 296 of the Executive Law by virtue of his ability to effect the terms and conditions of Professor Kalia's employment. Moreover, Boudreau is an aider and abettor who actually participated in the conduct giving rise to the claims of discrimination herein.

9.        Upon information and belief, Paul Occhiogrosso ("Occhiogrosso") is an individual citizen of the State of New York, a resident of the State of New York and is counsel to the President of CCNY.  Notably Occhiogrosso simultaneously maintains the office of Labor Designee, adjudicating grievance brought by faculty before him.  Wearing both these hats simultaneously routinely presented a clear conflict of interest for Occhiogrosso and a disservice to the faculty for whom he is supposed to be an impartial adjudicator.  Occhiogrosso qualifies as an "employer" for purposes of individual liability under New York Executive Law § 296, and

New York City Administrative Code §§ 8-107 and 8-502 because he participated directly in the discriminatory conduct at issue in this case and as an "employer" under § 296 of the Executive Law by virtue of his ability to effect the terms and conditions of Professor Kalia's employment. Moreover, Occhiogrosso is an aider and abettor who actually participated in the conduct giving rise to the claims of discrimination herein.

10.     Upon information and belief, Erec Koch ("Koch") is an individual citizen of the United State who works – and, upon information and belief, maintains a residence – in the State of New York and was the Dean of Humanities at CUNY.   Koch qualifies as an "employer" for purposes of individual liability under New York Executive Law § 296, and New York City Administrative Code §§ 8-107 and 8-502 because he participated directly in the discriminatory conduct at issue in this case and as an "employer" under § 296 of the Executive Law by virtue of his ability to effect the terms and conditions of Mr. Kalia's employment.  Moreover, Koch is an aider and abettor who actually participated in the conduct giving rise to the claims of discrimination herein.

<u>Preliminary Statement - Summary of Claims</u>

11.     Kalia's claims herein are based on the illegal discrimination -- including, but not limited to, disparate treatment, denial of promotion, and retaliation -- perpetrated against him by Defendants and various employees thereof, on the basis of his race and national origin, as well as in direct retaliation for his ongoing complaints of discrimination; all in direct contravention of Title VII, *et al.*[1]

---

[1] Claimant also has claims under New York Executive Law §296 and New York City Administrative Code §8-107 against the individual defendants.

12.     In sum, Kalia has been routinely and repeatedly discriminated against throughout the course of his tenure at CCNY from 1993 through the present.  In this latest iteration of Defendants' discriminatory and retaliatory abuse of Kalia, Defendants have succeeded in improperly derailing and precluding Kalia's designation as a Distinguished Professor ("DP").

13.     In contrast, Defendants have supported and effected the applications of non-Indian professors who have not complained of discrimination to the title of DP even when such applications are in direct contravention of long-standing practice and policy or when facilitating and enabling such candidacies clearly demonstrates an undisputable pattern of disparate treatment.

14.     The DP title is not only one that has a positive effect on a professor's marketability, standing and reputation, but also is accompanied by additional monetary compensation: currently in the range of $28,594.00 per annum.

15.     Perhaps most disturbing, and telling, as well as representative of CCNY's longstanding pattern of discrimination and retaliation were the actions and statements to Michele Baptiste, the Dean of Diversity, Compliance and Faculty Relations at CCNY, by the prior Dean of Humanities, Eric Weitz ("Weitz") and the counsel for CCNY, Paul Occhiogrosso ("Occhiogrosso").

16.     Both Weitz and Occhiogrosso expressed to Baptiste multiple times that because Kalia had litigated against the College he was not worthy of consideration as a DP.  As both Weitz and Occhiogrosso well knew, the only actions that Kalia brought against CCNY were for improper discrimination.

17.     The Defendants' discriminatory and retaliatory actions with regard to Kalia's DP designation are long-standing and ongoing.

18.     In addition, Defendants have also further discriminated and retaliated against Kalia by effecting an ongoing and continuous pattern of harassment and disparate treatment.

19.     In conjunction with the same, in recent years Respondents simultaneously dismantled former President Coico's Council on Diversity and stripped Kalia's role in liaising between CCNY and the Asian-American Research Institute and its constituents.  Kalia sat on the diversity committees of both organizations and remains on the AAARI Board to this day, even though CCNY and CUNY improperly cut his stipend with regard to that position and related duties.

20.     Defendants thereby demonstrated not only their discriminatory animus as to individuals of Asian descent and origin, but their particular discriminatory and retaliatory animus towards Kalia in particular.

21.     This animus is particularly troubling given the events across the country over the last years and the evident and increasing acts of discrimination and violence against Asian-Americans.

22.     Defendants have also effected the termination of an increasing number of African-American professors, especially females, over the last four years.

23.     In this regard, Kalia has suffered from the fostering by CCNY of an ongoing hostile discriminatory and retaliatory environment.  Kalia has also suffered as well as a result of CCNY's sanctioned and implemented retaliation against Kalia for making justified complaints of documented discrimination, retaliation, and clearly inappropriate and actionable disparate treatment. Unfortunately, despite his significantly increased national and international recognition, the continued success of his courses and his ever-growing body of scholarship, many of the same complaints that Kalia was forced to make before the EEOC and in Federal

Court over the past twenty years are still current and germane to the issues set forth herein. Kalia should not have to litigate to be treated commensurately with his non-Asian, non-Indian peers who have not previously been forced to complain about discrimination and retaliation at CCNY.

24.     It is an abject disgrace that Kalia has been thwarted, disparately treated, and denigrated at each step in his professional development at CCNY.

25.     Nevertheless, and despite such adversity at each stage, Kalia has ultimately prevailed.  He was improperly denied tenure.  He fought through the EEOC and the Courts as well as the Professional Staff Congress (Union) and was ultimately tenured.  He was denied full professorship.  He had to fight through the Courts again and, ultimately, was given the title to which he was more than due.

26.     Kalia was denied monies that had been promised and which were due him, commensurate with his position and title, but was, as set forth above, again forced to seek assistance from outside of CCNY to obtain the relief due to him.

27.     Now, Kalia again finds himself having to seek assistance outside of Defendants' purview to receive equal treatment and the benefits that are received by his, often less-qualified or improperly considered, Caucasian, non-Asian, non-Indian peers, who have not been forced to previously complain of discrimination and retaliation.

General History of Past Discrimination Against Kalia at CCNY By Way of Background and Context Only

28.     Kalia originally was hired by CCNY in 1993 with the promise that he would be placed on a very short tenure track.  Kalia was told that the only reason that he was not being hired with tenure was that a tenure track position was not available at that time.  In a May 4,

1994, memo, James Watts, then Chair of the History Department, "...expressed the Department's satisfaction with Professor Kalia's teaching performance...Professor Kalia expressed an interest in applying for tenure and for promotion to full professor beginning in 1994-1995 academic year and I agreed this would be timely...."

29.     Thereafter, in 1995, a sub-committee of Kalia's department reviewed Kalia's credentials thoroughly and unanimously recommended Kalia for early tenure. The Executive Committee of the History Department (5-0) and the Divisional Promotions & Budget Committee (8-0) also unanimously recommended Kalia for early tenure.  At the same time, the full professors in the History Department voted unanimously (12-0) to promote Kalia to full professor, and the Divisional P&B Committee followed suit voting seven in favor of Kalia's promotion with one abstention (7-0-1).  It was clear to all, both within and without the College, who reviewed Kalia's credentials that – based upon the contractually established criteria – he was qualified for both promotion and early tenure.

30.     In what would become a pattern of discrimination against Kalia, despite his universally accepted credentials, the former Dean, Martin Tamny, informed an independent third-party that Kalia would not, in fact, receive tenure.  True to his word, Tamny was able to use his clout to deny Kalia tenure at that time by belittling his candidacy at the College-Wide Review Committee, at which Tamny was called on to present Kalia's application.  Tamny later acknowledged that Kalia's qualifications warranted tenure.

31.     President Yolanda Moses reversed the Review Committee's decision, specifically finding that he met or exceeded the standards for tenure under the three categories set forth in the Collective Bargaining Agreement ("CBA"), namely scholarship, teaching and service and, in the

late summer of 1995, forwarded her recommendation to the Board of Trustees of CCNY, which universally followed her suggestions in employment matters.

32.     However, Kalia was granted neither promotion nor tenure.  Even so, in an attempt to resolve any outstanding issues, in April 1996, Kalia entered into a Settlement Agreement with the College, as represented by President Moses.  It was the clear and admitted understanding of those participating in the Agreement that the intent of that Agreement was to resolve the three (3) outstanding grievances (for non-reappointment, for non-promotion and for the negative tenure action), to resolve the complaints of Tamny and to resolve the issue of reappointment for the 1996-97 academic year.  President Moses communicated this resolution to Tamny and Frank Grande.

33.     Despite the settlement agreement and President Moses' communiques concerning the import of the same, Grande removed Kalia from two committees on which he served and retracted his phone privileges even though Kalia was never informed of any problems with any actions from that point on.

34.     Thereafter, prior to the Executive Committee Meeting in the Fall of 1996, Grande improperly separated Kalia's file into two sections: one containing documents negative to his candidacy (notably these documents were never signed by Kalia in direct contravention of the relevant By-Laws).  Grande did not separate any other applicant's file in a like manner.

35.     In fact, in direct contrast, non-stricken reprimands were left out of files for other professors coming up for reappointment, including Barbara Brooks, a Caucasian American married to David Jaffee, a Caucasian History Professor.  In direct contravention of the President's directive, Grande re-raised certain of Tamny's then resolved complaints at the

Executive Committee Meeting, in a flagrant disregard of the settlement agreement which was purposefully withheld from the other members of that meeting.

36.     As no other negative comments were made concerning Kalia during the meeting of the Executive Committee, it is clear that Grande's discriminatory and retaliatory actions were the sole cause of that adverse employment action and had the specific effect that Grande intended, namely a negative vote by the Executive Committee against Kalia for the 1997-8 academic year.

37.     Kalia was again forced to file an appeal – to combat the discriminatory treatment within his department – of his non-reappointment for the academic year 1997-98.  President Moses, at that time, ignored her prior determinations and denied Kalia's appeal due to concern over issues of "mutual trust and collegiality," but, nevertheless acknowledged, that his scholarship, teaching, and service were more than adequate to result in a positive tenure decision – facts that could hardly be denied as he had met those same standards the prior year.

38.     After Kalia's non-reappointment for the 1997-1998 academic year, he filed an action in the United States District Court for the Southern District on January 22, 1998, as well as a grievance with his union, Professional Staff Congress, seeking reinstatement.

39.     Ultimately, the matter was heard before an impartial arbitrator, Bonnie Siber Weinstock.  In her Opinion and Award dated September 1, 1998, the Arbitrator found that the College violated its own procedures (Article 18 of the CBA) in numerous ways, including, in failing to provide Kalia with a written evaluation concerning his performance in 1996. She further ruled that there was no documentation to indicate that Kalia needed to work on repairing the relationships with his colleagues; that the existence of a negative file as described by Professor Walter Struve was of great concern and the presentation of material in that manner was

in violation of Article 19 of the CBA; that numerous documents were improperly placed in Kalia's file in contravention of Article 19.2(e); that President Moses' reason for denying Kalia's reappointment was arbitrary; and that there was a "<u>reasonable likelihood that a fair academic judgment may not be made on remand if normal procedures are followed.</u>" (Emphasis added).

40.     As such, the Arbitrator afforded Kalia – what the College has termed – the "extraordinary" relief of reappointment and reconsideration of his future reappointment and tenure by an outside independent Select Faculty Committee.

41.     Despite being reappointed to his position as Associate Professor at the beginning of the school year in 1998 as a result of a positive ruling by Arbitrator Bonnie Weinstock, Kalia was not allowed to return to the College until Spring 1999 in retaliation for the pursuit of his prior grievances.  Ultimately, while litigation was pending, the independent, unbiased committee, not surprisingly, unanimously awarded Kalia tenure in 2000.

42.     In the Fall of 2000, Kalia once again applied for promotion to full professor based on the unanimous endorsement of his credentials by the Select Committee.  Kalia was voted up by the Department, but rejected by the division-wide Promotions and Benefits Committee (P&B).

43.     Kalia was forced to appeal this baseless decision and began again to suffer a new cycle of procedural violations again based on an improper and illegal retaliatory and discriminatory animus.

44.     Similarly to what CCNY has done with Kalia's application for DP over a decade later, the Review Committee then breached College and University policy by remanding Kalia's application to the Department, purporting to require new letters of recommendation.

45.     Such remand constituted three separate violations: (1) it improperly denied Kalia his due process rights to an independent academic review by the President, and, in fact, any right of appeal; (2) it improperly asserted that new letters or information could not be obtained by the Review Committee in direct contravention of written and standard policy; and (3) it improperly required an additional vote at the Department level insinuating to the Department professors that someone higher up the chain of command wanted to punish Kalia for his having sued the College and maintaining grievances against the College.  In addition, the continued request for new letters began, and ultimately did, tarnish Kalia's reputation in the academic world.  At some point, those solicited for additional letters of recommendation began to question why they were being requested to write the same letters over and over and over again.

46.     After filing various grievances concerning his non-promotion – and despite the facts that (1) Kalia had demonstrated the necessary qualifications for full-professor; (2) he had been recognized to have met the relevant criteria by distinguished faculty members approximately 6 years earlier; and (3) his credentials had only been enhanced in the intervening years as acknowledged in letters from external reviewers – on or about November 26, 2001, the Review Committee, without justifiable basis, reversed the P&B and denied Kalia's promotion.

47.     Kalia duly filed an appeal with Gregory H. Williams ("Williams"), the new President of the College, which was summarily denied.

48.     As he had to before, Kalia sought justification for this denial in a formal request for the President's reasons on or about March 13, 2002.  In his facially contradictory response dated March 27, 2002, Williams manifested an indefensible and blatant disregard for the standards of review, the relevant criteria for promotion determinations and a decision explicable

only in terms of the College's continued efforts to retaliate and discriminate against Kalia based upon his efforts to protect his civil rights.

49.     Initially, Williams properly identified the standard bases for promotion, namely teaching effectiveness and scholarship and professional growth.

50.     He agreed that Kalia's teaching, based upon peer and student evaluations, was more than adequate.

51.     Before more specifically addressing Kalia's scholarship and professional growth, Williams properly asserted that any promotion decision should be based upon "evidence of scholarly achievement following the most recent promotion."

52.     Although Williams quoted the proper standard, he absolutely, completely, blatantly and without any rational explanation ignored that standard and created his own personal test for determining whether or not to promote Kalia.  This knowing and flagrant flaunting of the College's and University's policies, rules and standards typifies the illegal, improper, and abusive treatment that Kalia has received at the hands of the College over his first seven years and which has now officially been repeated over the next 17 plus years.

53.     The undisputable reality is that Kalia never had a prior promotion decision at CCNY.  By CCNY's own rules and regulations, any act of scholarship achieved since arriving at CCNY should have been considered by Williams, who, in direct contravention of the known standards, examined only publications post-1998.

54.     Notably, even on the basis of those publications, Kalia's candidacy, in terms of scholarship, was significantly and materially superior to numerous Caucasian, non-Indian, non-Asian candidates who had been promoted and had not filed grievances alleging discrimination.

As a result of those continued transgressions and new acts of retaliation, Kalia filed a claim with the EEOC on or about November 18, 2002.

55.     While that matter was pending, CCNY and Williams attempted to address their obvious acts of discrimination and retaliation by reversing their earlier position and remanding Kalia's application to the Review Committee with the request that the Committee re-examine the application.

56.     Ultimately, some seven years after the full Professors in the History Department voted unanimously (12-0) to promote Kalia to full Professor and the Divisional P&B Committee followed suit (with a 7-0-1 vote) and then only after numerous legal actions, material time and expense, and Kalia's perseverance and availing of outside fact finders that Kalia was promoted to full professor.

57.     Even then, CCNY continued to discriminate and retaliate against Kalia.  One such area of ongoing discrimination and disparate treatment was the improper preclusion of Kalia from teaching graduate courses.

58.     Ultimately, it was only through the result of additional litigation and protections afforded by the EEOC, and under federal law, that Kalia was able to obtain in 2005 the back pay that was due to him.

59.     In the intervening years, Kalia continued to advocate for the rights of minority professors and continued to be at the wrong end of disparate treatment as a result.  Specifically, he served on the Executive Committee of the Faculty Senate from 2005 to 2013 and on the diversity committees of CCNY from 2012-2016 and of the Asian Asian-American Research Institute ("AAARI").

<u>Discrimination With Regard To Professor Kalia's Prior Bids To Obtain DP Status</u>

60.     Kalia first sought the DP designation in 2008-9 after completing his Fulbright Fellowship.  Recommendation letters – which were universally positive from qualified sources – were obtained.

61.     However, as predicted by various individuals, including his Department's Chair, with knowledge of CCNY's history of discrimination and retaliation against Kalia, that application for DP was denied at the Divisional P&B level.

62.     Understanding that nothing further could be accomplished while Dean Fred Reynolds and Williams were still in control and maintaining CCNY's pattern of disparate treatment, discrimination, and retaliation against him, Kalia took no further action at that time.

63.     With a change of administration, Kalia once again considered seeking the DP title in 2012.

64.     Unfortunately, while certain of the administrators had changed, the history of discrimination, disparate treatment and retaliation repeated itself, and Occhiogrosso had become CCNY's counsel in 2005.

65.     Shortly after Kalia expressed his intent to re-file for DP, he was told that he should not bother at that time because the then Dean of Humanities, Weitz, a Caucasian American, had placed his name up for consideration for DP.  In or about July 2013, Kalia met with Debbie Hartnett, the senior executive assistant for President, to express his concerns about fair treatment in the DP process, given the past discrimination and the seeming acceptance of Weitz's application.

66.     Despite the fact that Weitz was an administrator at that time and, therefore, precluded under the PSC-CUNY Collective Bargaining Agreement (specifically Article 23

thereof) Weitz was approved and granted DP status and the accompanying approximate $28,594.00 in additional annual compensation in violation of, *inter alia*, State laws prohibiting the same for individuals in his position as an administrator. This constitutes just one further example of the disparate treatment afforded Kalia at CCNY.

67.     In the Fall of 2013, serious questions arose as to potential improprieties with regard to the voting within, and with regard to, the Faculty Senate.  Kalia was vocal about the discriminatory aspects of such issues.

68.     These issues continued to be discussed, including the marginalization of minorities, and especially Asians, in 2014.   In or about November 2014, a review of the senate faculty voting concluded, *inter alia*, that the By-Laws had not been followed.

69.     Against this backdrop, Weitz continued to subject Kalia to disparate treatment including, but not limited to, objecting to Kalia's serving on the Humanities Inclusion Committee; refusing to incorporate his comments concerning discrimination in addenda for the faculty senate; and refusing to address the possibility of expanding or otherwise bolstering Asian studies within the Humanities.

70.     In February 2015, Kalia wrote to the then Chair of his Department, Craig Daigle ("Daigle") about restarting his DP bid.  Rather than encouraging Kalia, Daigle took active steps to hinder, delay or otherwise sabotage Kalia's opportunity to obtain DP status.

71.     First, Daigle, without basis, suggested that one of the professors who nominated Kalia had not even read Kalia's work.

72.     Then, on or about March 20, 2015, Daigle informed Kalia that he would move Kalia's application forward with the two nominations then provided.

73.     However, Daigle then proceeded to contradict this representation some ten (10) days later when he asserted that he would only move the process forward if Kalia got a nomination from within the History Department.  Tellingly, the By-Laws have no such requirement.  Moreover, past precedent within the Department – for non-Asians who had never complained about discrimination – was to accept nominations from outside of the Department. In fact, in the past, applications for DP status by non-Asian, non-Indian professors who had never complained of discrimination were considered with only a single nomination from outside the Department – clearly demonstrating the improper, discriminatory treatment foisted on Kalia by CCNY.

74.     Only after receiving pressure from, among others, Baptiste, who, along with Hartnett secured clearance from CUNY Central on this point, did Daigle reverse course once again in May 2015, when he agreed to proceed with the two nominations originally presented. Daigle did not treat the application of a female Caucasian in the same manner.

75.     The disparate treatment between the files of these two candidates would only become more stark as the process moved forward.

76.     In sum, Daigle, Weitz and CCNY, upon information and belief, with guidance from Occhiogrosso, refused to obtain relevant letters to review Kalia's candidacy or give his file a fair, unbiased review.  No non-Asian faculty who have not complained of discrimination have had their DP nominations thwarted in such a vindictive and retaliatory manner.

77.     The disparate treatment of Kalia by Daigle extended beyond the treatment of his DP file, but also included improperly chastising Kalia for a non-existent error with the posting of grades for certain of Kalia's students – something Daigle did not do to other non-Asian faculty who had not complained of discrimination.

78.     Despite the facts that Kalia's external letters of support from distinguished institutions around the world were glowing as to his scholarship and that his credentials more than met the DP criteria, Kalia's initial application was denied while the application of the Caucasian professor –  who had never complained about discrimination and who was known by CCNY to have plagiarized Kalia's course outline in an application for a federal grant – was pushed through in 2017.

79.     In the interim, in 2015, Kalia's case was referred to Baptiste by Coico, who had initiated several measures to correct improper conduct at the College and attempt to generate an atmosphere of inclusiveness and collegiality.

80.     Baptiste reviewed Kalia's file and reported to Coico that indeed Arbitrator Weinstock had been perceptive in foreseeing retaliatory behavior against and disparate treatment of Kalia.  Baptiste further found that from 2015 to the present, Daigle and Weitz, now Dean of Humanities, while being advised by Occhiogrosso, attempted to prevent Kalia from being considered for the promotional title of DP by contriving not to secure external reference letters by excuses, delays, and falsehoods.  Baptiste also found that Occhiogrosso (as well as, Weitz) also attempted to steer and/or influence her decision when Kalia appealed to Baptiste for assistance.

81.     Shortly after Kalia's case was referred to Baptiste, Weitz and Occhiogrosso questioned why she would help Kalia and asserted that, because Kalia had litigated against CCNY, Kalia was not worthy of consideration for DP.

82.     One such brazen effort by Weitz and Occhiogrosso to influence Baptiste's independent evaluation of Kalia's dossier took place in the office of Provost Maurizio Trevisan in 2015, who did absolutely nothing to challenge the improper actors.

83.     In the following years, on several occasions, the same message was delivered to Baptiste as she tried to move Kalia's DP matter forward by, among other things, requesting that Weitz and Daigle secure external references for Kalia.

84.     While Occhiogrosso engaged in smearing and perpetrating clear and improper retaliation against Kalia (bad acts for which he tried to enlist Baptiste's assistance in perpetuating), Occhiogrosso omitted to mention to Baptiste or Coico that he, Occhiogrosso, had represented CCNY and CUNY with regard to Kalia's earlier litigation.  Even after Weitz moved on, his replacement, Doris Cintron, also engaged in prevarication to hinder obtaining the requisite reference letters. Tellingly, Cintron emailed Kalia requesting referee names the day before a Special Committee (constituted by Coico for the sole purpose of assuring Kalia's and Beth Baron's files were complete) met in 2015. Tellingly, that Committee went beyond its specifically prescribed mandate by denying the DP position to Kalia: another abuse condoned, or otherwise overlooked, by Defendants.

85.     In October 2016, Coico resigned.  In November 2016, Boudreau became interim President.

86.     Kalia continued to ask Baptiste about his file and external letters, but Baptiste was unable to provide any answer to Kalia, because, upon information and belief, the new Administration offered her no guidance.

87.     In March 2017, Kalia wrote to then Interim President Boudreau hoping to persuade him to start diversifying CCNY's administration in terms of expanding the presence of minorities to reflect predominantly minority make-up of the student body.  Ultimately, Boudreau did exactly the opposite and even took it upon himself to dismantle the President's Council on Diversity reaffirming CCNY's disdain for minorities.

88.     Kalia met with Boudreau and Mary Driscoll, the interim Provost, in early April 2017.  Boudreau promised Kalia that Kalia had not "lost any ground" and that Boudreau would be instructing the new Dean of the Humanities, Erec Koch, the new Department chair, Anne Kornhauser, and Provost Mary Driscoll to move forward with the task of securing updated reference letters.  Contrary to Boudreau's specific and distinct representations to Kalia, and with the express imprimatur of CCNY and Boudreau, no action was taken by any of these individuals.

89.     After no such efforts were made, Kalia once again reached out to Baptiste who recommended that Kalia try to meet with  Boudreau again.  That meeting also did not bring about any action.

90.     On or about July 18, 2017, Kalia again wrote Boudreau to ascertain what progress had been made in securing the necessary letters.  No response was forthcoming.

91.     Kalia again reached out to Baptiste.

92.     Finally, in response to Baptiste's ongoing inquiries, in October 2017, Boudreau asserted to Baptiste somewhat disingenuously – and in direct contradiction of his prior statements on the subject –  that since Kalia's case for DP had twice not been cleared to be referred to him for action, he, Boudreau, was unable to act on it.

93.     Kalia's attempt to be considered for this prestigious title had again been thwarted by CCNY and its employees who are so brazen in their contempt for the law that they are willing not only to admit to their improper retaliatory motives, but also to attempt to recruit others – including CCNY's Dean for Diversity and Compliance – to participate in their actionable discrimination and retaliatory scheme.

94.     In essence, the Defendants demonstrated the tragic maxim, "Justice delayed is justice denied."  By stringing out Kalia's DP nomination over a period of years, the Defendants

so convoluted the process that in 2018 Kalia was forced to not only file a Charge with the EEOC and a related suit, but also to actually recommence (for a 4th time) his candidacy for DP.

<u>Discrimination With Regard To Kalia's Most Recent DP Candidacy</u>

95.     During the pendency of the prior Charge, Kalia met with Koch on or about May 7, 2019, close to ten (10) months after his renewed nomination from Charles Watkins concerning, *inter alia*, the lack of progress – as orchestrated by, *inter alia*, Defendants – on Kalia's DP bid, which was clearly ongoing at that point. Following Kalia's meeting with Koch (attended by Department Chair Kornhauser), on or about May 22, 2019, Koch wrote to Kalia asserting that he, Koch, had full confidence in the Department Executive Committee and Chair Kornhauser and that Kalia's DP candidacy would be properly handled.  (See email attached as Exhibit "B").

96.     On June 19, 2019, Kornhauser and Kalia exchanged emails concerning books for his DP candidacy.  (See email attached as Exhibit "C").  Thereafter, three additional months passed with little or no progress, which prompted Kalia, on or about September 26, 2019, to summarize the latest events concerning his DP bid to Kornhauser.  (See email attached as Exhibit "D").

97.     Shortly thereafter, Kalia and another colleague, Rishi Raj, received what can only be described as a hate-filled, vitriolic racist communication from a former CUNY employee. While CUNY was facially sympathetic to Professor Raj; Kalia, who was, in their eyes, to be treated differently as he had complained of discrimination in the past, was not even given those courtesies.  (See email chain attached as Exhibit "E").

98.    Over the following months, while some of the letters were collected, CUNY continued to drag its feet, with Kornhauser actually telling certain potential referees not to bother sending in their recommendations.

99.    In April 2018, Dean Baptiste, who was shepherding Kalia's candidacy and also investigating two other cases that involved misconduct by Boudreau and Occhiogrosso, was terminated by Boudreau.

100.    In the interim, on December 12, 2019, President Boudreau, after bypassing the candidates recommended by an independent committee after an intensive search staffed by a group of committed faculty and staff, gained special permission from CUNY, appointed Diana Cuozzo to the permanent position of CCNY's new Chief Diversity Officer.  The position was previously held by Ms. Baptiste, an African-American female, who has since leveled charges of discrimination, retaliation, and disparate treatment as against CCNY.  (A copy of the Affidavit executed by Ms. Baptiste in connection with Kalia's most recent Federal Complaint is attached hereto as Exhibit "F".  A copy of Ms. Baptiste's complaint to the State Division of Human Rights is attached hereto as Exhibit "G").

101.    Effective December 2019, Lesley Lokko, a UK-trained, Scottish-Ghanaian architect, academic and best-selling novelist, was named the Dean of the Bernard and Anne Spitzer School of Architecture at The City College of New York.  Less than ten months later, when resigning, Lokko noted that race "is never far from the surface of any situation in the U.S." and "I suppose I'd say in the end that my resignation was a profound act of self-preservation." She also recognized, concerning race in the US in general and at CCNY in particular, that she,

" lacked the tools to both process and deflect it. The lack of respect and empathy for Black people, especially Black women, caught me off guard, although it's by no means unique to Spitzer."

102.     Tellingly, it was only after learning, for the first time on or about March 17, 2020, that CUNY and Kornhauser had taken the position that some of the potential referees had not responded or refused to provide recommendations, that Kalia conducted some additional inquiries and learned of these additional improprieties.  (See email attached as Exhibit "H").

103.     Thereafter, on May 26, 2020, Kalia wrote to Koch about the ongoing delays in his DP process – which had now been pending, even in the latest iteration, for years.  In that correspondence, Kalia noted the clear disparate treatment concerning his DP Nomination.

104.     While Caucasian candidates were approved in contravention of New York State financial regulation or in improper *quid pro quo* reciprocity for prior DP votes and other personnel actions were moved forward, Kalia's candidacy continued to languish.

105.     Kalia also noted how such disparate treatment was directly linked to the ongoing discrimination and retaliation from Occhiogrosso, who, as noted above, hade specifically and, apparently unabashedly, told, *inter alia*, Ms. Baptiste, the former Chief Diversity Officer and Dean that Kalia should not be given DP status because he had previously sued CCNY for discrimination and retaliation with regard to his failed internal bids for tenure and full professor – both of which positions were awarded upon independent review.

106.     Koch refused to address the issue – despite his prior promises to address the situation earlier – and directed Kalia to contact Kornhauser again.  Kalia noted that, as Koch was aware as he had been cc'd on many of the relevant correspondence, Kornhauser had been non-

23

responsive to prior requests which was one of the reasons that Kalia had needed to reach out to Koch again.

107.    On June 19, 2020, Kalia specifically clarified in writing and in response to Koch that the disparate treatment suffered by his DP candidacy and the structured racism within CCNY and CUNY were intertwined.

108.    On September 20, 2020, Kalia again wrote to Koch as to the status of his DP candidacy and again reminded Koch of the past and ongoing improper influence of Occhiogrosso and Weitz in connection with the disparate and retaliatory treatment suffered by his DP candidacy, as well as the conflict of interest for Occhiogrosso in being in charge of labor relations for CCNY while remaining as Boudreau's special counsel.

109.    In response Koch asserted that Kalia's DP candidacy would be presented to the Department and then, if approved, go to the P&B Committee for review and approval.

110.    Given that Kornhauser had specifically informed Kalia that the Department had already reviewed, and approved, his candidacy and that prior Caucasian candidates for DP from the Department, namely Stein, Weitz, and Baron, who had not complained about discrimination, did not have to have their candidacies reviewed by the Department, the ongoing disparate treatment and retaliation against Kalia and his DP candidacy was again made completely obvious.

111.    When Kalia did not get any response to his follow-up inquiry, he wrote to Koch again on September 27, 2020, highlighting various aspects of the disparate treatment suffered by his DP candidacy.

112.    Koch finally responded with a convoluted email in which he, inter alia, denied any responsibility for investigating Messrs. Weitz or Occhiogrosso concerning their alleged

retaliation and discrimination against Kalia, and instead referred him to Cuozzo, who he cc'd on

that email.  (This email chain is attached as Exhibit "I").

113.    Approximately two weeks later, and shortly after Lokko's resignation was made

public in October 2020, Kalia wrote to his Dean, Koch; his Chair, Kornhauser; Boudreau; and

various members of the executive team at CCNY, asking that the systematic racism on campus

be addressed and to express his hopes once again that Boudreau would lead "in promoting

cultural/racial sensitivity.

114.    Rather than respond directly, Boudreau instructed Cuozzo to respond to Kalia

which she did not by addressing the substance of the complaint and request, but by listing the

forms and entities through which Kalia could file a more formal complaint.

115.    Tellingly, Cuozzo was specifically aware of Kalia' knowledge of these

methodologies and their reiteration was only a pro forma rebuff of his complaints.  Kalia,

nevertheless duly responded to Cuozzo, on October 30, 2020, highlighting that: (1) her apparent

conflict of interest in investigating any allegations against Boudreau and the administration; (2)

the material number of coerced resignations and improper termination of minority

employees/professors at CCNY over the prior three years; (3) recognizing that Boudreau and

Professor Rajan Menon were currently defendants in a harassment/discrimination suit by one

former female faculty member (that has since settled for an amount in excess of $1,000,000.00);

and (4) that Boudreau's characterization of the need to "unmask the racialist myths that divide

us" was derisive and "emblematic of the disregard by the College of the ongoing discomfort felt

by minorities on the Campus."

116.    On November 23, 2020, well after Kalia's DP candidacy was supposed to have

been heard by the P&B Committee, the Federal Court dismissed Kalia's then pending claim

concerning his DP candidacy relying on a determination that Kalia's claim was limited to a prior iteration of his DP candidacy which the Court deemed to have been resolved in 2015 thus rendering the claims untimely.

117.    The background facts concerning that failed bid and CCNY's inappropriate actions concerning the same are related above.  Clearly, then emboldened by the effectiveness of their delay strategy and the fact that their clear abuses had been dismissed (albeit on a technicality concerning timeliness), CCNY decided to move forward with an actual determination on Kalia's DP nomination.

118.    On December 1, 2020, Kornhauser requested that Kalia provide information as to any projects that he was currently working on.  Kalia duly responded with a recent publication in an anthology; the two current book length works in progress that were to be published by Routledge U.K.; a recent invitation to teach a seminar in Israel; and a joint editing with Professor Mahesh Rangarajan on an anthology on Nehru, "Nehru and the Making of Postcolonial India."

119.    On December 10, 2020, the P&B of the Division of Humanities and the Arts under the improper influence of the current Dean of Humanities & the Arts, and as a culmination of the most recent pattern of harassment, retaliation and disparate treatment voted not to recommend Kalia for appointment as a Distinguished Professor.  This latest discriminatory act was communicated to Kalia by Koch by correspondence dated December 11, 2020. (See correspondence attached hereto as Exhibit "J").

120.    Kalia was eminently qualified for DP status, in fact, by any objective measures, he clearly met and exceeded the standards for DP.  He was passed over for this title, and the accompanying salary increase because of his race and in retaliation for his ongoing complaints of discrimination and attempts to address the systematic racism and discrimination at CCNY.  (See

recommendation/nomination letter from Charles B. Watkins attached hereto as Exhibit "K").
Moreover, it is clear that his candidacy was much stronger than prior Caucasian candidates who
had not complained of discrimination from his same Department and/or Division, including, but
not limited to Stein, Weiss, and Baron.

121.    Unfortunately, even during the ongoing pandemic, Kalia has continued to suffer
additional harassment and disparate treatment after the improper denial of his DP Candidacy.
Kalia was not even given the courtesy of a response to his January 8, 2021, correspondence to
Koch (and cc'd to Kornhauser and Boudreau) concerning the P&B decision of December 10,
2020, and requesting that his long-time harassers and retaliators, Occhiogrosso and Weitz, recuse
themselves from any personnel actions concerning Kalia.  Apparently improperly using one's
influence and power to detrimentally effect the livelihood of a colleague in admitted retaliation
for his filing of a complaint of discrimination is perfectly acceptable at CCNY and CUNY.
There could not be a more egregious example of retaliatory intent than an in-house counsel
attempting to persuade a Dean of Diversity not to assist an employee in pursing grievances for
disparate treatment simply because that employee had previously sued (successfully, no less) the
employer for discrimination previously.

122.    Occhiogrosso had been systematically scheming to undermine Kalia's tenure at
CCNY ever since arriving on the Campus in 2005.  Soon after arriving on the Campus, he
solicitously told Kalia in front of the Administration Building that he had discouraged CUNY
leadership from litigating against Kalia in the 1990s.  Kalia, being falsely led to understand that
Occhiogrosso wanted to bury the proverbial hatchet, shook hands with Occhiogrosso.
Occhiogrosso, however, had different plans.  Occhiogrosso purposefully and deceptively never
told anyone in the Administration about his personal involvement in Kalia's earlier litigation. He

still occupies two conflicting positions: as a labor designee he exercises undue influence on deans and chairs in divisions and departments, while his legal credentials make him credible to members of the Administration.  Occhiogrosso's influence continues to harm Kalia.  As Koch told Kalia on a number of occasions, including during the latest DP bid, that he—Koch—needed to consult Occhiogrosso on the matter of reference letters for Kalia.

123.    Shortly thereafter, on January 18, 2021, Kalia made a sabbatical request to Kornhauser in an effort to maintain collegiality and give Kornhauser the courtesy of knowing of his request.

124.    Despite having due notice of Kalia's intent and needs, as well as an internal deadline of January 31, 2021, Kornhauser did not timely respond to Kalia's request and, instead, not only did she not tell Kalia of the deadline, but also she intentionally waited until March 5, 2021, to respond.

125.    In that untimely response, Kornhauser for the first time informed Kalia of the January 31, 2021, deadline and denied Kalia the right to take his requested sabbatical.  Tellingly, Daigle, a Caucasian professor who had not complained of discrimination and who had routinely assisted in the delay to Kalia's DP candidacy was recently allowed to take a sabbatical out of cycle.

126.    The denial of courses, the denial of tenure, the continued and unrepentant disparate and retaliatory treatment, have had a detrimental effect on Kalia's health and have undoubtedly created a hostile work environment.  While waiting for a response concerning his request for a sabbatical, Kalia also made request, in February 2021, to teach a historiography class – an opportunity he has sought for some ten years.

127.    Not only was his explicit (and repeated) request ignored, but a Caucasian, non-Indian, professor with less experience and fewer qualifications who had not complained of discrimination was given the opportunity to teach such a class while Kornhauser denied that she had ever known Kalia had requested such a class even when his email to her requesting such an opportunity was placed directly before her.  Clearly, CCNY and various actors within its management continue to have no issue with disparate treatment or retaliation when it comes to Kalia.

128.    Despite the ongoing personal cost and continued retaliation, Kalia continues to fight for equal treatment and the end of discrimination at CCNY and CUNY.  He maintains his position as a Board Member of The Asian American Asian Research Institute (AAARI) and personally addresses and confronts racism where he can, including taking a public stand against the abuses suffered by Asian Americans, especially in the Spring of 2021.

129.    Kalia has continued to address the ongoing racism at CCNY specifically calling attention to the corruption within the process of selecting the prior Dean – in which the English chair secured signatures from other divisional chairs in a petition to remove the only candidate of color, a woman, from the pool of candidates for no understandable reason – and seeking to prevent a similar issue from arising in the current search.

130.    As a direct result of these ongoing discriminatory and retaliatory acts on the part of Defendants, Kalia has suffered, and continues to suffer, injury and harm.

<u>AS AND FOR A FIRST CAUSE OF ACTION</u>
(Race and National Origin Discrimination Under Title VII and Against CUNY)

131.    Plaintiff repeats, realleges, and reiterates each and every allegation set forth in paragraph "1" to "130" above with the same force and effect as if fully set forth herein at length.

132.     Kalia filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission.

133.     Kalia received a Notice of Right to Sue Letter from the EEOC and filed this lawsuit within 90 days of receipt of that Notice.

134.     Kalia is an individual of Indian, and Asian, national origin, a non-Caucasian.

135.     As set forth above, CUNY has repeatedly discriminated against Kalia on the basis of his race and national origin over the last two decades and has been routinely found to have violated Kalia's rights.

136.     As set forth above, most recently, CUNY has discriminated against Kalia, *inter alia*, by improperly delaying, denying and precluding Kalia from obtaining the position and title of DP.

137.     As set forth above, no Caucasian or non-Indian Professors were treated in a like shabby manner.  Specifically, Caucasian professors, including, but not limited to, Stein, Weitz, and Baron, were promoted to DP on improper bases despite being eminently less qualified than Kalia.

138.     As a direct result of these discriminatory acts, Plaintiff has suffered injury and harm in an amount to be determined at trial, and requests a judgment in an amount to be determined at trial, but in no event less than Four Hundred and Fifty Thousand Dollars ($450,000.00) in compensatory damages; Five Million Dollars ($5,000,000.00) in punitive damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION
(Hostile Work Environment Claim Under Title VII Against CUNY)

139.    Plaintiff repeats, realleges, and reiterates each and every allegation set forth in paragraph "1" to "138" above with the same force and effect as if fully set forth herein at length.

140.    Kalia filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission.

141.    Kalia received a Notice of Right to Sue Letter from the EEOC and filed this lawsuit within 90 days of receipt of that Notice.

142.    Kalia is an individual of Indian, and Asian, national origin, a non-Caucasian.

143.    As described above, CUNY has repeatedly discriminated against Kalia on the basis of his race and national origin over the last two decades and has been routinely found to have violated Kalia's rights.

144.    CUNY has actively effectuated, condoned and ratified – despite reprimand from the EEOC, Courts, and independent arbitrators – a two decade long, systematic pattern of abuse and harassment against Kalia.

145.    Even after Kalia has been vindicated by third-parties and entities and individuals not controlled by CUNY, CUNY has, at times, self-corrected after the fact so as to avoid public censure in response to various filed actions, it has steadfastly not prevented further abuses, but rather has allowed additional abuse to be perpetrated against Kalia.

146.    This continued, repetitive, and sustained nature of the abuse acts by CUNY, and its employees, and agents against Kalia has created and fostered an objectively and subjectively hostile environment that has unduly affected the terms and conditions of Kalia's employment.

147.    In addition to the stripping of duties; the preclusion from teaching graduate level courses; the preclusion from sitting on committees that need additional members; the need to go

outside of CUNY to achieve tenure and promotion; the denial of DP opportunities and processing; the baseless cessation of his stipend; the non-payment for work agreed to be compensated and which Kalia actually completed; the ongoing and continuous harassment concerning his attempts to protect his civil rights and those of other minorities, as well as the rules and regulations of CUNY and the CBA; Kalia has been shunted into hard to access classrooms; given an office virtually on top of one of his prior antagonists (Weitz); subjected to routine denigration and spiteful looks; subjugated to an environment wherein he is routinely shunned and avoided by faculty who do not want to be subject to similar mistreatment at the hand of the Individual Defendants herein; given excessive and disproportionately heavy lower-level class loads; has been given unfavorable teaching schedules; denied opportunities to teach specifically requested classes and subject matters; and forced to work in an environment wherein it has been documented on numerous occasions that minorities are not treated the same as Caucasians.

148.    "The 2012 State of Minorities at CCNY" prepared by Charlie Watkins on the direction of President Coico emphatically and clearly portrays a poor picture of minorities at CCNY.  Subsequent reports that were prepared on the direction of President Coico following the rigging of 2013 Senate election also corroborate the deliberate marginalization of minorities at CCNY.

149.    The May 2013 Faculty Senate Plenary was stormed by several faculty members and scheduled elections were postponed to September.  Weitz and George Ranalli, then Dean of Architecture, along with several other individuals were instrumental in organizing the siege; minutes from the History Department meeting were falsified to install a phony senator; and Professor Jamal Manassah presented the evidence to Occhiogrosso, who willfully ignored it.

150.    In another instance,  Daniel Akins, an African-American professor who was legitimately elected senator in the Chemistry Department, was replaced by David Jeruzalmi who became Senate Chair and started systematically issuing disinformation in favor of the Boudreau Administration to cover up for the Administration's wrongdoings.

151.    Thereafter, the December 2021 Plenary of the Faculty Senate was unusual in that it was conducted jointly by the Chair and the Executive Committee, and together, along with loyal satraps, they ratified the minutes from the November (2021) Plenary completely obliterating Boudreau's rendition of the settlement of $1.1 million with Lynda Dodd—a case in which Boudreau, and Occhiogrosso, the President's Counsel, along with others were intimately involved.

152.    The Dodd case had emerged during the 2017-18 presidential search when Boudreau was dean of the Colin Powell School and had put in his name as a candidate for the top job, despite the administrative reprimand issued him by Baptiste for misconduct in his dealings with Dodd. In short, the Senate entered into a symbiotic relationship with the Administration. And notably,  during the 2013 siege of the Senate, Occhiogrosso circled around Kalia purposefully and gleefully muttering: "We're living in interesting times."

153.    Three investigative reports documented all these irregularities, and yet no one was made accountable—just what Lesley Lokko had noted that there was no accountability at the College.  As a naturalized citizen, Kalia was faithful to the oath to the Constitution and called out every wrongdoing he noted rather than go along with the flow.

154.    As a direct result of CUNY's creation of a hostile work environment for Kalia based on his race and national origin, as well as the leading role that he has played in advocating for the rights of minorities and against discrimination at CUNY, Plaintiff has suffered injury and

harm in an amount to be determined at trial, and requests a judgment in an amount to be

determined at trial, but in no event less than Four Hundred and Fifty Thousand Dollars

($450,000.00) in compensatory damages; Five Million Dollars ($5,000,000.00) in punitive

damages; the costs and disbursements of this action, including reasonable attorneys' fees; all

relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

<u>AS AND FOR A THIRD CAUSE OF ACTION</u>
(Race and National Origin Discrimination, and Creation of A Hostile Work Environment Under
New York State and City Statutes Against Boudreau, Occhiogrosso, and Koch)

155.    Plaintiff repeats, realleges, and reiterates each and every allegation set forth in

paragraph "1" to "154" above with the same force and effect as if fully set forth herein at length.

156.    Both the New York Executive Law and the New York City Administrative Code

prohibit workplace discrimination, adverse employment decisions and disparate treatment on the

basis of race and national origin.

157.    Kalia is an individual of Indian, and Asian, national origin, a non-Caucasian.

158.    As set forth above, each of the Individual Defendants qualify as employers under

the relevant statutes or otherwise were aiders and abettors under New York Executive Law in

that they each actively participated in the wrongful conduct giving rise to the claims for

discrimination and retaliation in this matter.

159.    As set forth above, the Individual Defendants took specific actions against Kalia

with the express intention of negatively effecting the terms and conditions of Kalia's

employment and of precluding him from taking advantage of various possibilities.

160.    As set forth above, the Individual Defendants aided and abetted their own

violations and bad acts in discriminating against Kalia.

161.    The Individual Defendants, and especially Occhiogrosso, have exhibited a

lengthy, sustained – while sometime pernicious and often flagrant – campaign of harassment

against Kalia on the basis of his race and national origin.

162.    The Individual Defendants did not treat Caucasian or non-Indian employees in the

same manner.

163.    This continued, repetitive, and sustained nature of the abuse acts by the Individual

Defendants against Kalia has created and fostered an objectively and subjectively hostile

environment that has unduly affected the terms and conditions of Kalia's employment.

164.    As a direct result of the Individual Defendants discrimination against Kalia based

on his race and national origin, Plaintiff has suffered injury and harm in an amount to be

determined at trial, and requests a judgment in an amount to be determined at trial, but in no

event less than Four Hundred and Fifty Thousand Dollars ($450,000.00) in compensatory

damages; One Million Dollars ($1,000,000.00) in punitive damages; the costs and disbursements

of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief

to Plaintiff as this Court deems just and proper.

<u>AS AND FOR A FOURTH CAUSE OF ACTION</u>
(Retaliation Under Title VII Against CUNY)

165.    Plaintiff repeats, realleges, and reiterates each and every allegation set forth in

paragraph "1" to "164" above with the same force and effect as if fully set forth herein at length.

166.    As set forth above, Kalia has made numerous complaints of discrimination,

including his recent filing with the EEOC, for violations of his own civil rights.  In addition he

has made, and continues to make, complaint on behalf of other employees of CUNY and to

attempt to hold bad actors accountable for their acts of discrimination, disparate treatment and

retaliation.

167.    Rather than learn from its experiences, CUNY has chosen to effectively double-down on its mistreatment of Kalia and to expressly retaliate against him for making these protected complaints in direct violation of relevant law.

168.    Directly after complaining about discrimination, Kalia suffered adverse consequences, including, but not limited to – effective preclusion from applying and obtaining the DP title and position, the denial of the opportunity to teach graduate courses, and the denial of his agreed upon and ultimately earned supplement – and further abuse.  Thereafter, directly after his continued complaints of discrimination and the dismissal of his federal claims for discrimination – primarily on timeliness grounds – Defendants orchestrated the final denial of Kalia's DP bid.  This act was clearly in furtherance of the ongoing retaliatory scheme perpetrated and sustained by Defendants as against Kalia.

169.    There was no legitimate basis for the adverse consequences or the additional and continued abuse.  They were made against Kalia because he complained – internally and externally –  that he, and others, were being discriminated against because of their being a member of a protected class.

170.    As a direct result of this improper retaliation, Plaintiff has suffered injury and harm in an amount to be determined at trial, and requests a judgment in an amount to be determined at trial, but in no event less than Four Hundred and Fifty Dollars ($450,000.00) in compensatory damages; Five Million Dollars ($5,000,000.00) in punitive damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

AS AND FOR A FIFTH CAUSE OF ACTION
(Retaliation Under New York State and City Statutes Against Boudreau, Occhiogrosso and Koch)

171.    Plaintiff repeats, realleges, and reiterates each and every allegation set forth in paragraph "1" to "170" above with the same force and effect as if fully set forth herein at length.

172.    Both the New York Executive Law and the New York City Administrative Code prohibit workplace discrimination, adverse employment decisions and disparate treatment on the basis of race and national origin.

173.    As set forth above, each of the Individual Defendants qualify as employers under the relevant statutes or otherwise were aiders and abettors under New York Executive Law in that they each actively participated in the conduct giving rise to the claims for discrimination and retaliation in this matter.

174.    As set forth above, Kalia has made numerous complaints of discrimination, including his recent filing with the EEOC, for violations of his own civil rights.  In addition he has made, and continues to make, complaint on behalf of other employees of CUNY and to attempt to hold bad actors accountable for their acts of discrimination, disparate treatment and retaliation.

175.    As set forth above, the Individual Defendants took specific actions against Kalia in retaliation for his protected complaints.

176.    As set forth above, in particular Occhiogrosso asserted to various individuals that Kalia was not worthy of fair treatment and did not deserve the position of DP because he had sued CUNY to protect his civil rights in the past.

177.    As set forth above, the Individual Defendants aided and abetted their own violations and bad acts in retaliating against Kalia.

178.    As set forth above, directly after complaining about discrimination, Kalia suffered adverse consequences, including, but not limited to – effective preclusion from applying and obtaining the DP title and position and further abuse.

179.    There was no legitimate basis for the adverse consequences or the additional and continued abuse.  They were made against Kalia because he complained – internally and externally –  that he, and others, were being discriminated against because of their being a member of a protected class.

180.    As a direct result of this improper retaliation, Plaintiff has suffered injury and harm in an amount to be determined at trial, and requests a judgment in an amount to be determined at trial, but in no event less than Four Hundred and Fifty Dollars ($450,000.00) in compensatory damages; One Million Dollars ($1,000,000.00) in punitive damages; the costs and disbursements of this action, including reasonable attorneys' fees; all relevant interest; and any such other relief to Plaintiff as this Court deems just and proper.

### AS AND FOR A SIXTH CAUSE OF ACTION
(Tortious Interference with a Contract Against Boudreau, Occhiogrosso, and Koch)

181.    Plaintiff repeats, realleges, and reiterates each and every allegation set forth in paragraph "1" to "180" above with the same force and effect as if fully set forth herein at length.

182.    Kalia had an agreement with CUNY through the PSC.

183.    The Individual Defendants were aware of this contract.

184.    As part of the agreement between Kalia and CUNY, Kalia had the right to apply for additional titles, positions and titles, certain of which, as in the case of the title and position of DP, provided additional compensation and acclaim.

185.    The Individual Defendants acted intentionally to prevent Kalia from effectuating this aspect of his agreement with CUNY without any justification or valid basis.

186.    The Individual Defendants have successfully precluded Plaintiff from obtaining the position and title of DP.

187.    As a result of this tortious interference, Plaintiff has suffered injury and harm in an amount to be determined at trial, but in no event less than Three Hundred Thousand Dollars ($300,000.00), plus interests, costs, expenses and fees, including attorneys' fees.

## AS AND FOR A SEVENTH CAUSE OF ACTION
(Tortious Interference With A Potential Economic Advantage Against Boudreau, Occhiogrosso and Koch, in the alternative)

188.    Plaintiff repeats, realleges, and reiterates each and every allegation set forth in paragraph "1" to "187" above with the same force and effect as if fully set forth herein at length.

189.    Kalia had a business relationship with CUNY and the opportunity to enhance that relationship and obtain an economic incentive through becoming a DP.

190.    The Individual Defendants were aware of this business relationship and the opportunity to enhance that relationship and obtain an economic incentive through becoming a DP.

191.    The Individual Defendants acted intentionally and with malice aforethought when they sought to interfere with this business relationship and the opportunity to enhance that relationship and obtain an economic incentive through becoming a DP; and, more specifically, when they acted to preclude, deny and otherwise prevent Kalia from obtaining the position of DP.

192.    The Individual Defendants thwarted Kalia's attempts to achieve this benefit solely out of malice and to harm Kalia and for no other reason, much less any proper or justifiable reason.

193.    In so acting, the Individual Defendants lied about necessary criteria; directly and improperly interfered with the DP process and Plaintiff's application; improperly influenced the action and behaviors of other individuals involved with the DP process: all to further their own improper, malicious and villainous agenda.

194.    The Individual Defendants have successfully precluded Plaintiff from obtaining the position and title of DP.

195.    As a result of this tortious interference, Plaintiff has suffered injury and harm in an amount to be determined at trial, but in no event less than Three Hundred Thousand Dollars ($300,000.00), plus interests, costs, expenses and fees, including attorneys' fees.

<u>Jury Demand</u>

196.    Plaintiff hereby demands a trial by jury.

WHEREFORE, Kalia respectfully demands judgment against Defendants on his various causes of action set forth herein, along with any such other relief to Kalia as the Court deems just and proper.

Dated:  New York, New York
        September 1, 2022

_____
Ethan Leonard, Esq.
The Law Offices of Neal Brickman, P.C.
Attorneys for Ravi Kalia
420 Lexington Avenue - Suite 2811
New York, New York 10170
(212) 986-6840
(212) 986-7691 (Fax)